Lawrence S. Lustberg, Esq.
Jessica L. Hunter, Esq.
GIBBONS P.C.
One Gateway Center
Newark, NJ 07102-5310
(973) 596-4500
llustberg@gibbonslaw.com
jhunter@gibbonslaw.com

*Attorneys for Plaintiffs American Civil Liberties Union of New Jersey and American Civil Liberties Union, Inc.*

OF COUNSEL:
Jeanne LoCicero, Esq.
American Civil Liberties Union of
    New Jersey Foundation
89 Market Street, 7th Floor
Newark, NJ 07102
(973) 854-1715
jlocicero@aclu-nj.org

David Cole, Esq.*
American Civil Liberties Union
    Foundation, Inc.
915 15th St. NW
Washington, DC 20005
(202) 675-2330
dcole@aclu.org

Brian Hauss, Esq.*
American Civil Liberties Union
    Foundation, Inc.
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

*\* Pro hac vice applications to be submitted*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **AMERICAN CIVIL LIBERTIES UNION OF NEW JERSEY,** a New Jersey nonprofit corporation, and **AMERICAN CIVIL LIBERTIES UNION, INC.,** a District of Columbia nonprofit corporation**,** <br><br> **Plaintiffs,** <br><br> **v.** <br><br> **GURBIR S. GREWAL**, in his official capacity as Attorney General of New Jersey**, ERIC H. JASO**, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission**,** | **Case No.  19-CV-17807** <br><br> *Document Electronically Filed* <br><br> **COMPLAINT** |

1

|  |  |
| --- | --- |
| **STEPHEN M. HOLDEN**, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, and **MARGUERITE T. SIMON**, in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission, | |
| **Defendants.** | |

Plaintiff American Civil Liberties Union of New Jersey (89 Market Street, 7th Floor, Newark, NJ 07102) and Plaintiff American Civil Liberties Union, Inc. (125 Broad Street, 18th Floor, New York, NY 10004), by and through their attorneys, Gibbons P.C., the American Civil Liberties Union of New Jersey Foundation, and the American Civil Liberties Union Foundation, Inc., for their Complaint against Defendants Gurbir S. Grewal, in his official capacity as Attorney General of New Jersey (Office of the Attorney General, Hughes Justice Complex, 25 Market Street, Box 080, Trenton, New Jersey 08625); Eric H. Jaso, in his official capacity as Chairperson of the New Jersey Election Law Enforcement Commission (New Jersey Election Law Enforcement Commission, P.O. Box 185, Trenton, NJ 08625); Stephen M. Holden, in his official capacity as Commissioner of the New Jersey Election Law Enforcement Commission (same); and Marguerite T. Simon in her official capacity as Commissioner of the New Jersey Election Law Enforcement Commission (same), allege, on knowledge as to their own actions, and otherwise upon information and belief, as follows:

## PRELIMINARY STATEMENT

1.     Plaintiffs American Civil Liberties Union of New Jersey ("ACLU-NJ") and American Civil Liberties Union, Inc. ("National ACLU") bring this action pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2 seeking a declaration that New Jersey Senate Bill 150 of 2019 ("S150" or "the Act"), P.L. 2019, c.124, *et seq.*, to be codified at N.J.S.A. 19:44A-3, *et seq.*, effective

October 15, 2019, violates the First and Fourteenth Amendments to the United States Constitution and Article I, Paragraphs 1, 6, and 18 of New Jersey Constitution.  Plaintiffs also seek an Order enjoining the Defendants from enforcing the Act.

2. S150, passed and signed into law despite New Jersey Governor Phil Murphy's express concerns about its constitutionality, creates a new class of organization in New Jersey: the "independent expenditure committee" ("IEC").  S150 subjects any existing organization falling within that class to onerous regulations, including: 1) requirements that it publicly disclose certain donors; and 2) restrictions barring certain persons from holding leadership positions within that organization.

3. Specifically, S150 defines an IEC as any 501(c)(4) or 527[1] organization that raises or spends $3,000 or more annually for the purposes of (1) influencing state or local elections, including the outcome of public questions; (2) influencing legislation or regulation; or (3) providing "political information," broadly defined as any statement containing facts or reflecting the organization's opinion about a candidate or public question, legislation, or regulation.

4. If an organization falls within the scope of this far-reaching definition, S150 requires it to disclose publicly the name, mailing address, occupation, and employer of any person contributing more than $10,000 to the organization.  S150 also requires the IEC to disclose "all

---

[1] "501(c)(4)" and "527" refer to sections of Subchapter F of the federal Internal Revenue Code ("IRC"), 26 U.S.C. § 501, *et seq*.  501(c)(4) organizations are "[c]ivic leagues or organizations not organized for profit but operated exclusively for the promotion of social welfare, or local associations of employees . . . [,]" *id*. at § 501(c)(4), while a 527 organization is a "political organization[:] . . . a party, committee, association, fund, or other organization . . . organized and operated primarily for the purpose of directly or indirectly accepting contributions or making expenditures, or both, for an exempt function," *id*. at § 527(e)(1).

expenditures made by it in excess of $3,000," including the name and address of the person to whom the expenditure was made.[2]

5. S150 also restricts an IEC's ability to choose its own leaders, by (1) barring any person who chairs a political party committee or a legislative leadership committee from serving as the IEC's chairman or treasurer; and (2) barring any candidate or public office holder from "establish[ing], authoriz[ing] the establishment of, maintain[ing], or participat[ing] in the management or control" of an IEC.

6. By imposing these requirements on IECs, S150 burdens speech and expressive and associational conduct in a manner that goes far beyond what is permitted by the First Amendment to the Constitution of the United States and by the New Jersey Constitution of 1947.  With respect to the Act's donor disclosure requirements, S150 presents IECs with three untenable choices: (1) obey the law and publicly disclose their donors, though the First Amendment protects against being required to do so; (2) break the law and subject their staff and board members to criminal and civil penalties; or (3) extract themselves from the scope of the law by giving up the protected advocacy activities that would otherwise define them as IECs.[3]  S150 likewise prevents IECs from freely choosing their own leadership unless they forgo the very activities that would otherwise bring them within the Act's definition of an IEC.  Furthermore, S150 runs afoul of the Fourteenth Amendment

---

[2] The Act defines "contributions" and "expenditures" to include "all loans and transfers of money or other thing of value to or by any . . . independent expenditure committee . . . and all pledges or other commitments or assumptions of liability to make any such transfer[.]"  N.J.S.A. 19:44A-3(d).  "Other thing of value" is defined as "any item of real or personal property, tangible or intangible, but shall not be deemed to include personal services *other than paid personal services*." *Id*. at -3(l) (emphasis added).

[3] For organizations exempt from federal income taxation under IRC § 527, these untenable choices may also come with an associated tax risk, as the basis on which a 527 organization is recognized as exempt from taxation rests generally on making expenditures for speech about candidates for elected or appointed office.

to the U.S. Constitution and New Jersey Constitution's due process protections because its ill-defined terms and poor drafting render the law—which includes criminal penalties—unconstitutionally vague.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343 because it arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

8.     This Court has supplemental jurisdiction over the Plaintiffs' remaining state law claims pursuant to 28 U.S.C. § 1367.

9.     Venue lies in this district under 28 U.S.C. § 1391(b) because the Defendants reside in the District and a substantial part of the events giving rise to Plaintiffs' claims have occurred or will occur in this district.

## PARTIES

10.     Plaintiff ACLU-NJ, founded in New Jersey in 1960, is a private, nonpartisan, non-profit membership organization and a tax-exempt social welfare corporation under section 501(c)(4) of the Internal Revenue Code ("IRC").  ACLU-NJ's principal place of business is in Newark, New Jersey.

11.     ACLU-NJ is dedicated to the principles of liberty and equality embodied in the Constitutions of the United States and of New Jersey.  ACLU-NJ has more than 41,000 members and thousands of supporters throughout New Jersey.  ACLU-NJ engages in public education and

lobbying to protect the civil rights of New Jerseyans.[4]  It is the state affiliate of Plaintiff National ACLU.

12.     Plaintiff National ACLU is also a private, non-partisan, non-profit membership organization that qualifies as a tax-exempt social welfare corporation under IRC 501(c)(4).  It is organized under the Nonprofit Corporation law of the District of Columbia.

13.     National ACLU engages in public education and lobbying about the constitutional principles of liberty and equality.  National ACLU is dedicated to the advancement and protection of the civil rights and civil liberties guaranteed in the U.S. Constitution and our nation's civil rights laws.  National ACLU has affiliates and chapters in every state, Washington, D.C., and Puerto Rico, and has more than 1,500,000 members and supporters nationwide.[5]

14.     Defendant Gurbir S. Grewal is the Attorney General of the State of New Jersey and the state's chief law enforcement officer.  As Attorney General, Defendant Grewal's official duties include the enforcement of civil and criminal violations of S150.  N.J.S.A. 52:17B-97, *et seq.*; N.J.S.A. 2A:158-4; N.J.S.A. 19:44A-6(b), 21(b), 22(a).  The Attorney General and his successors are sued in their official capacities.

15.     Defendant Eric H. Jaso is the Chairperson of the New Jersey Election Law Enforcement Commission ("ELEC").

---

[4] ACLU-NJ's work is complemented by that of the American Civil Liberties Union of New Jersey Foundation, a nonprofit, nonpartisan 501(c)(3) organization with an identical mission, that engages in advocacy strategies appropriate for an organization with its tax-exempt status.  These advocacy strategies primarily include litigation and public education.

[5] National ACLU's work is also complemented by that of the American Civil Liberties Union Foundation, Inc., a New York nonprofit, nonpartisan IRC § 501(c)(3) organization with an identical mission, that engages in advocacy strategies appropriate for an organization with its tax-exempt status.  These advocacy strategies primarily include litigation and public education.

16.     Defendants Stephen M. Holden and Marguerite T. Simon are Commissioners of ELEC.

17.     Together, Defendants Jaso, Holden, and Simon are responsible for enforcing S150, including conducting hearings on possible violations, imposing penalties, and initiating civil actions to enforce compliance, enjoin violations, or recover penalties.  N.J.S.A. 19:44A-6(b).  They are also empowered to promulgate regulations and perform such other duties as are necessary to implement S150, including but not limited to forwarding to Defendant Grewal for prosecution information concerning potential criminal violations of S150.  *Id*.  Defendants Jaso, Holden, and Simon and their successors are sued in their official capacities only.

## FACTS

### I.     The legislative history of S150 and its predecessor bill, S1500.

18.     Governor Murphy signed S150 into law on June 17, 2019, after the bill was introduced in the New Jersey Senate on June 10, 2019 and passed by both houses of the legislature that same day through the use of emergency resolutions.

19.     The content of S150 had previously reached the Governor's desk once before; S150 is identical to S1500, a bill passed by the New Jersey legislature on March 25, 2019.  Governor Murphy conditionally vetoed S1500 on May 13, 2019.   *See* Governor's Conditional Veto Statement   to   N.J.   Senate   Concerning   S1500   (May   13,   2019), https://www.njleg.state.nj.us/2018/bills/s1500/1500_V1.pdf ("Conditional Veto").

20.     In a statement accompanying his conditional veto of S1500, Governor Murphy explained his decision not to sign the bill by noting that it "may infringe on both [constitutionally protected speech and association rights]," because, *inter alia*, it would impose disclosure requirements on IECs as a result of those organizations' advocacy efforts unrelated to elections;

would create a blanket prohibition on the participation of public officeholders with regard to the control of IECs; would exclude corporations other than 501(c)(4)s or 527s from the ambit of the law; and would allow 501(c)(4)s or 527s to avoid the strictures of the law by coordinating their activities with a candidate for public office or a political party, as well as because it contained many drafting errors that the Governor believed might affect the substantive operation of the law and "spawn time-consuming litigation."

21.     Following the Conditional Veto, a sponsor of S1500 indicated that members of the New Jersey Legislature were "actively discussing" overriding Governor Murphy's conditional veto of S1500.  Matt Arco, *Democrats could deal Murphy a huge blow as they mull a veto override on 'dark money' bill*, NJ.com (May 30, 2019, updated June 9, 2019), https://www.nj.com/politics/2019/05/democrats-could-deal-murphy-a-huge-blow-as-they-mull-a-veto-override-on-dark-money-bill.html.

22.     Instead of pursuing a veto override, the New Jersey Legislature ultimately passed the contents of S1500 in an identical bill, S150, which Governor Murphy signed.

23.     Governor Murphy's signature on S150 was accompanied by a signing statement that again expressed his concerns that the requirements and scope of the bill "may infringe upon constitutionally protected speech and association rights" for the reasons expressed in his Conditional Veto of S1500.  *See* Governor's Statement Upon Signing Senate Bill No. 150 (June 17, 2019), http://d31hzlhk6di2h5.cloudfront.net/20190617/d5/6c/b5/d7/94c04a9f14b0b88b6254ca19/S150.pdf ("Signing Statement").

24.     Governor Murphy further noted in his Signing Statement that he was approving S150 "based on an express commitment" from the New Jersey Legislature that it would "introduce

and swiftly pass legislation" that would limit the law's disclosure requirements "to election-related advocacy."

25.     To date, legislation modifying the impact of S150 has not been passed and the bill is to take effect as written on October 15, 2019.

## II.     S150's Regulation of IECs

### a.     Donor Disclosure and Expenditure Reporting Requirements

26.     S150 modifies the New Jersey Campaign Contributions and Expenditures Reporting Act to introduce the term "independent expenditure committee" into New Jersey law and to impose new regulations on organizations meeting the law's definition of that term.  S150 defines an IEC as a 501(c)(4) or 527 organization

> that engages in influencing or attempting to influence the outcome of any election or the nomination, election, or defeat of any person to any State or local elective public office, or the passage or defeat of any public question, legislation, or regulation, or in providing political information on any candidate or public question, legislation, or regulation, and raises or expends $3,000 or more in the aggregate for any such purpose annually[.]

N.J.S.A. 19:44A-3(t).[6]

27.     S150 defines "political information" as a statement in any form, "including, but not limited to, press releases, pamphlets, newsletters, advertisements, flyers, form letters, Internet or digital advertisements, or radio or television programs or advertisements[,]" that:

> reflects the opinion of the members of the organization on any candidate or candidates for public office, on any public question,

---

[6] Excluded from S150's definition of an IEC are 501(c)(4) or 527 organizations that (1) "fall within the definition of any other organization subject to the [New Jersey Campaign Contributions and Expenditures Reporting Act];" or (2) coordinate their activities with any candidate or political party as determined by ELEC.  N.J.S.A. 19:44A-3(h).  Neither exception is applicable to Plaintiffs.

> or which contains facts on any such candidate, or public question
> whether or not such facts are within the personal knowledge of
> members of the organization.

N.J.S.A. 19:44A-3(h).  While the provision of S150 that creates the "IEC" classification connects the term "political information" to legislation and regulation, in addition to candidates and public questions, N.J.S.A. 19:44A-3(t), the definition of "political information" itself refers only to candidates and public questions, N.J.S.A. 19:44A-3(h), thereby creating confusion about what conduct constitutes the provision of political information and therefore qualifies an organization as an IEC.

28.     If an organization meets the definition of an IEC, S150 subjects it to "cumulative quarterly" reporting requirements regarding its donors and its spending.  N.J.S.A. 19:44A-8(d)(1). The reports must be submitted to ELEC "not later than April 15, July 15, October 15 and January 15" of each year.  N.J.S.A. 19:44A-8(d)(1).  The reports will then be made publicly available on ELEC's website.  *See* N.J.A.C. 19:25-2.4(a); *see also* N.J.S.A. 47:1A-1 *et seq*.

29.     Each report must list "all contributions received in excess of $10,000" and, for those contributions, disclose "the name and mailing address of each person or group [making a contribution] and the amount contributed[.]"  If the contributor is an individual, the IEC must disclose the "occupation of the individual and the name and mailing address of the individual's employer."  N.J.S.A. 19:44A-8(d)(1).  S150 also requires disclosure of the same information for persons or groups who co-sign loans for the organization.  *Id*.

30.     The Act provides no geographic limitation on the donors who must be disclosed under the law; nor do its provisions limit disclosure to donors who earmark their donations for spending on covered activities within New Jersey.  As a result, every donor who makes a qualifying contribution(s) must be disclosed, regardless of whether the donor has any connection to New

Jersey and even if the donor expressly intended the contribution(s) to be used outside of New Jersey or expressly restricted the contribution(s) to use for some other activity entirely.

31.     S150 does not clearly state whether only a lump sum contribution of $10,000 triggers the disclosure requirements or whether an individual person or group's cumulative donations over time totaling more than $10,000 trigger inclusion in the IEC's cumulative quarterly reports.

32.     Assuming cumulative donations of more than $10,000 can trigger disclosure obligations, S150 fails to define the time period in which these contributions must be made in order to trigger inclusion in a quarterly reports.  S150 states in relevant part that:

> Each [IEC] shall file with [ELEC], not later than April 15, July 15, October 15 and January 15 of each calendar year, a cumulative quarterly report . . . of all contributions received in excess of $10,000 . . . , and of all expenditures in excess of $3,000 [made for certain purposes], during the period ending 48 hours preceding the date of the report and beginning on the date on which the first of those contributions was received or the first of those expenditures was made, whichever occurred first.  The quarterly report, . . . , shall contain the name and mailing address of each person or group from whom [contributions] have been contributed since 48 hours preceding the date on which such previous report was made and the amount contributed by each person or group in excess of $10,000[.]

33.     S150, therefore, does not state whether an individual's contributions must total more than $10,000 within a certain time period in order to subject that individual's personal information to disclosure.  Assuming, for example, that an IEC made its last report on July 15, one of the four quarterly reporting deadlines, and intends to make its next report on October 15, S150 would require the October report to cover a period ranging from July 13 through October 13; however, the report leaves open the possibility that an individual's contribution(s) made in a previous quarter or even years prior could combine with contributions made during that period to

total more than $10,000 and thus trigger reporting requirements.[7]  Because of the lack of clarity in the Act, it is possible that S150 would encompass not only high-dollar donors giving more than $10,000 once within a quarter or once a year, but also smaller-dollar donors who have given smaller amounts over time, which add up to $10,000.

34.    With respect to the IEC's spending, each report must include a listing of all of its

> expenditures in excess of $3,000 made, incurred, or authorized by it in influencing or attempting to influence the outcome of any election or the nomination, election, or defeat of any person to State or local elective public office or the passage or defeat of any public question, legislation, or regulation, or in providing political information on any candidate or public question, legislation, or regulation[.]

N.J.S.A. 19:44A-8(d)(1).  Expenditures to be disclosed include, but are not limited to, those made "for electioneering communications, voter registration, get-out-the-vote efforts, polling, and research."  N.J.S.A. 19:44A-8(d)(2).

35.    S150 further requires the IEC to report "the name and address of each person, firm, or organization to whom expenditures have been paid [during the reporting period] and the amount and purpose of each such expenditure."  *Id*.  It is unclear whether this provision applies only to expenditures of more than $3,000 made for the purposes stated elsewhere in N.J.S.A. 19:44A-8(d)(1), or whether it applies to all of an IEC's expenditures, of any value, made for any purpose, including, for example, salaries paid to individual employees, rent paid to a landlord for an IEC's office space, or money paid to a local shop that provides printing services to an IEC.

36.    An IEC's treasurer is required to "certify the correctness of each report[.]"  N.J.S.A. 19:44A-8(d)(2).

---

[7] Compounding this problem is the Act's failure to define the reportable date of a contribution, leaving IECs to guess at, for example, whether a contribution is reportable when a check is received versus when it is deposited, or even when a future gift is pledged.

37.     S150 imposes civil penalties for violations of its reporting requirements. Specifically, any person who violates the reporting requirements of S150, even inadvertently, is subject to a penalty of up to $8,600 for the first offense and up to $17,200 for each violation thereafter.  N.J.A.C. 19:25-17.3; *see also* N.J.S.A. 19:44-22(a)(1).

38.     S150 also renders purposeful violations of its reporting requirements crimes of the fourth degree.  Thus, any person who purposely[8] (1) "files or prepares or assists in the preparation for filing or purposely acquiesces in the preparation or filing of any report required under this act which the person knows is false, inaccurate or incomplete in any material particular;" (2) "fails or refuses to file any such report when required to do so pursuant to the provisions of [the] act;" or (3) "supplies any information which he knows to be false, inaccurate or incomplete to any person preparing or assisting in the preparation of any such report, with the knowledge that such information is intended for the purposes of such report" faces being charged with—and potentially convicted of—a crime of the fourth degree.  N.J.S.A. 19:44A-21(b).

### b.  Leadership Restrictions

39.     Separate and apart from its reporting and disclosure requirements, S150 also prevents an IEC from freely selecting its own leadership.  Specifically, it bars persons who are "serving as the chairman of a political party committee or a legislative leadership committee" from serving as either the chairman or "organizational treasurer" of an IEC.  N.J.S.A. 19:44A-10.  It

---

[8] The New Jersey Code of Criminal Justice provides that a person "acts purposely with respect to the nature of his conduct or a result thereof if it is his conscious object to engage in conduct of that nature or to cause such a result" and "acts purposely with respect to attendant circumstances if he is aware of the existence of such circumstances or he believes or hopes that they exist."  N.J.S.A. § 2C:2-2(b)(1).  This definition, in combination with S150's description of the acts criminalized, does little to advise a person of ordinary intelligence whether his or her conduct with respect to an IEC's reporting obligation runs afoul of the law, and reveals yet another way in which S150 is unconstitutionally vague.

also prevents any "candidate or holder of public office" from "directly or indirectly[] establish[ing], authoriz[ing] the establishment of, maintain[ing], or participat[ing] in the management or control of any [IEC]." *Id.* The terms "holder of public office" and "public office" are not defined by the Act. *Id.; see also* N.J.S.A. 19:44A-3.

40.     These restrictions on an IEC's ability to choose its own leaders apply regardless of whether the organization's advocacy is limited to a particular level of government or whether the leader in question ever stood for election to public office. For example, S150 would prevent a local school board member appointed to fill a vacancy on the board—presumably a "holder of public office" under the Act—from serving on the board of an IEC that advocates solely at the state level and in areas unrelated to education.

## III.    **ACLU-NJ and National ACLU**

### a.   **If ACLU-NJ and National ACLU continue their past advocacy efforts, they will be IECs under the Act.**

41.     As 501(c)(4)s, both ACLU-NJ and National ACLU are organized and operated for the tax-exempt purpose of promoting the social welfare. Under longstanding internal policies, neither ACLU-NJ nor National ACLU endorse or oppose candidates for elected office.[9]

42.     Because of their tax-exempt status, Plaintiffs are subject to comprehensive reporting requirements enforced by the Internal Revenue Service ("I.R.S."). The Plaintiffs are required to file annually with the I.R.S. a Form 990 (Return of Organization Exempt from Tax) which, among other things, has required each plaintiff to disclose the identity of donors giving

---

[9] Where a jurisdiction uses a broader definition of what constitutes "express advocacy," National ACLU has previously filed independent expenditure reports in candidate races.

$5,000 or more.  This donor information is kept confidential by the I.R.S. and is not made publicly available.  Donations to the Plaintiffs are not tax-exempt.

43.     ACLU-NJ and National ACLU are also regulated by the State of New Jersey through various state laws, including the New Jersey Charitable Registration and Investigation Act, N.J.S.A. 45:17A-18, *et seq*., and the New Jersey Legislative and Governmental Process Activities Disclosure Act, N.J.S.A. 52:13C-19, *et seq*.

44.     Consistent with its tax-exempt status as a 501(c)(4), ACLU-NJ may engage in lobbying, and, to that end, employs and contracts with individuals who are registered as lobbyists in New Jersey.  As a result, ACLU-NJ files an "Annual Report of Represented Entity" with ELEC each year.

45.     Both ACLU-NJ and National ACLU have engaged in the types of activities regulated by S150 in the past and have spent more than $3,000 annually on those activities.  If each organization continues to engage in these activities at a similar level after October 15, 2019, it will meet the Act's definition of an IEC and be subject to additional regulation under the Act.

46.     Specifically, ACLU-NJ engages in a wide variety of speech on matters of public concern related to its mission of promoting civil rights and civil liberties.  These communications include both direct and grass roots lobbying of legislators or other public officials, as well as many other communications that constitute pure issue advocacy or are intended only to educate the public.

47.     ACLU-NJ actively engages in lobbying efforts in New Jersey, including the use of registered governmental affairs agents to communicate ACLU-NJ's support for or opposition to specific legislation directly to government officials.  ACLU-NJ also engages in regulatory advocacy, including availing itself of public participation in the regulatory process as provided for

15

in New Jersey's Administrative Procedures Act, N.J.S.A. 52:14B-4, and through informal advocacy including encouraging regulators to develop, amend, or rescind regulations or policies that impact civil rights and civil liberties.  ACLU-NJ also leads and participates in several coalitions of partner organizations working to advance civil rights and civil liberties, including through legislation.  ACLU-NJ also uses email alerts to educate its members and the general public more broadly about public policy, regulatory issues, and specific legislation and to ask them to take action in support or opposition to that legislation, such as by using a form available through ACLU-NJ's website to send a message to their state legislators.

48.     As just one example, ACLU-NJ has recently been an integral part of advocacy efforts designed to urge the New Jersey Legislature to pass legislation that would legalize marijuana use in the state and provide an expungement mechanism for past marijuana-related criminal convictions.  Its lobbyists have actively engaged with legislators about the organization's position on bills that would reform the state's marijuana laws, including supporting Senate Bill No. 2703 ("S2703"), a highly anticipated legalization bill that nearly reached a vote in the New Jersey Legislature earlier this year.

49.     As part of this work, ACLU-NJ is a founding member of New Jersey United for Marijuana Reform, a coalition of public safety, medical, civil rights, faith, political, and criminal justice reform organizations and individuals committed to changing New Jersey's laws to legalize, tax, and regulate marijuana for adults aged 21 and older.  ACLU-NJ engages in public education, community organizing, and legislative strategy as a member of this coalition.  For example, ACLU-NJ sent email "action alerts" to its network, encouraging New Jerseyans to send messages to their legislators through ACLU-NJ's website urging those legislators to support this year's marijuana legalization bill, S2703, and its corresponding Assembly bill, A4497.

50.     As another example, ACLU-NJ, supported in part by a grant from National ACLU, was one of the most prominent advocates before the Legislature and the Governor with regard to reform of New Jersey's bail system, which led to the adoption of the Bail Reform Act,  S946/A1910,  P.L. 2014, c.31, codified at N.J.S.A. 2A:162-15 *et seq*.

51.     ACLU-NJ also maintains a presence on various social media websites, including Facebook and Twitter.  Its posts on these websites cover a variety of topics, and range from purely educational commentary to calls for action on specific legislation or policy matters.  As of August 2019, ACLU-NJ had more than 11,000 followers on Facebook and nearly 15,000 on Twitter.

52.     ACLU-NJ also regularly publishes op-eds and statements in newspapers and blogs, which are often linked to or published on its own website, www.aclu-nj.org.  Some of these publications urge particular action by an elected official or government body.  For instance, in March 2019 ACLU-NJ's executive director co-authored an op-ed published in The Star-Ledger and also appearing on NJ.com, urging the New Jersey Assembly not to endorse S1500, the Act's predecessor bill, in the form approved by the New Jersey Senate, but rather to tailor the bill to regulate only organizations with close ties to candidates for political office.  Often, however, ACLU-NJ's columns merely highlight a policy issue and/or advocate with respect to that or another issue.  For example, in a statement posted to its website in April of this year, ACLU-NJ drew attention to the resignation of a local police director credibly alleged to have made racist and sexist slurs, criticized the mayor of the municipality's response to those allegations, and called for increased transparency and accountability in policing.

53.     ACLU-NJ also seeks to educate the public generally about issues that are important to the organization, including by releasing legislative scorecards that document how state legislators voted on bills affecting civil rights and civil liberties, such as free speech and gender

equity.  ACLU-NJ's legislative scorecards contain facts about particular pieces of legislation and legislators and convey the organization's opinion about the importance of these bills and the significance of a vote for or against them.

54.    ACLU-NJ also seeks to educate the public by publishing educational materials, such as reports that contain information about issues which may be before the legislature in some form.  For example, in December 2018, ACLU-NJ and its counterpart the ACLU-NJ Foundation jointly released a report entitled "Private Property, Police Profit: Explaining and Reforming Civil Asset Forfeiture in New Jersey," which presented data on the use of civil asset forfeiture in New Jersey municipalities and counties over a five-month period in 2016.  At the time the report was issued, legislation affecting the practice of civil asset forfeiture had already been introduced in the New Jersey Assembly and several other civil asset forfeiture reform bills would later be introduced in early 2019.

55.    These activities clearly bring ACLU-NJ within the scope of S150's regulation because they are activities through which ACLU-NJ either (1) influences or attempts to influence "the passage or defeat of . . . legislation[] or regulation[;]" or (2) "provid[es] political information on any candidate or public question, legislation, or regulation[;]" or sometimes does both.  *See* N.J.S.A. 19:44A-3(t).

56.    ACLU-NJ's expenditures on the communications of the type described above have already totaled more than $3,000 in 2019.  These expenditures include the costs of maintaining ACLU-NJ's website and the salaries of ACLU-NJ staff.

57.    As part of its work to advance and defend civil rights and civil liberties around the country, National ACLU from time to time makes grants and provides other support, such as the use of national technological platforms, to its affiliates, including ACLU-NJ.

58.     For example, earlier this year National ACLU sought to support ACLU-NJ's efforts to reform the state's marijuana laws by paying for a patch-through calling campaign which sought to 1) inform New Jersey residents about a reform bill pending before the state legislature; and 2) direct calls from residents supportive of the bill to the offices of their state legislators.

59.     National ACLU also operates the online platform ACLU People Power, peoplepower.org, which connects ACLU supporters with activism and educational opportunities around the country, including phonebanking events, organizing meetings, trainings, and rallies. Earlier this year, for example, People Power offered volunteers the opportunity to make calls to New Jerseyans asking them to contact Governor Murphy and express support for a bill that would reform solitary confinement practices in New Jersey.   ACLU-NJ and National ACLU later sent a thank you email to volunteers who had taken part in the campaign.  People Power and its tools are paid for by National ACLU.

60.     National ACLU also supports its affiliates, including ACLU-NJ, through the provision of grants earmarked for specific advocacy campaigns.  National ACLU has made grants to ACLU-NJ totaling over $350,000 in the course of approximately the last six years.  Most recently, ACLU-NJ received a $45,000 grant from National ACLU in support of its efforts to advance pretrial justice issues, including bail reform, in the state.  Past grants from National ACLU to ACLU-NJ have supported work around issues such as marriage equality, the school-to-prison pipeline, and marijuana reform.

61.     Additionally, National ACLU staff regularly consult with and otherwise provide assistance on an in-kind basis to affiliate staff, including staff at ACLU-NJ.  This work often involves the provision of strategic and policy advice about legislation or legislative campaigns from National ACLU's expert staff, and, as a result, may qualify as an expenditure made for the

purpose of "engag[ing] in influencing or attempting to influence . . . the passage or defeat of . . . legislation, or regulation" in New Jersey or "providing political information" thereon.  N.J.S.A. 19:44A-3(t).

62.     National ACLU has spent more than $3,000 per year engaging in these activities in New Jersey thus far in 2019.

### b.   The Act's Impact on ACLU-NJ and National ACLU

63.     Contributions from individual donors are an important source of funding for ACLU-NJ and National ACLU's work.

64.     Indeed, the development staff of each Plaintiff routinely approach donors and potential donors in an attempt to solicit contributions, including contributions in excess of $10,000, that will fund their organizations' advocacy work.  Per the internal policies of ACLU-NJ and National ACLU, all donors' personal information is kept confidential and not publicly disclosed without permission of the donor.

65.      Because ACLU-NJ and National ACLU often work on controversial issues of public interest, including work related to reproductive health, freedom of religion, and the rights of LGBTQ people and immigrants, many donors avail themselves of anonymity.  Donors often view their support for the organization as a private matter because there can be disagreement about ACLU-NJ and National ACLU's positions within a donor's family, social, and employment circles.

66.     National ACLU and its state affiliates around the country frequently take positions on behalf of high profile and unpopular clients, issues, and causes.  National ACLU and its affiliates also frequently advocate on behalf of marginalized communities.  As a result, there is a

long history of threats and harassment directed toward ACLU-affiliated organizations and individuals whose association with the organizations is made public.

67.     There is therefore a reasonable and justifiable concern that public disclosure of the identities of Plaintiffs' respective donors may subject them to harm, threats, harassment, or reprisals by members of the public.

68.     For example, in the 1970s, at least five members of the New York Civil Liberties Union ("NYCLU"), the New York state affiliate of National ACLU, became subject to community hostility after their names and addresses were made public pursuant to a statutory reporting scheme.   A federal court ruled that as a consequence these individuals were deterred from associating with the NYCLU.  *NYCLU v. Acito*, 459 F. Supp. 75 (S.D.N.Y. 1978).

69.     More recently, in 2007, a man dressed in a black robe regularly appeared at the offices of National ACLU and NYCLU in lower Manhattan.  The man marched outside the building waving signs that denounced the organizations' staff members as "dogs" and "Jews."  He also maintained a website that charged that the organizations were parties to a Jewish conspiracy.  The website contained photographs of several National ACLU and NYCLU staff and clients.

70.     In July 2010, a man named Byron Williams loaded his car with guns, strapped on body armor, and headed for San Francisco with the intention of killing employees at the offices of the ACLU of Northern California and the Tides Foundation, a philanthropic organization that supports environmental preservation and other social justice issues.  Police pulled Williams over before he reached his destination when they noticed him driving erratically, and a brief gunfight ensued.

71.     In June 2013, a high-ranking official with the ACLU's Iowa affiliate received a threatening letter the day after commenting in a newspaper on an ACLU report that addressed

racial disparities in marijuana arrests.  The letter stated, "Get your nasty ass out of Iowa by July 1st or end up like that Darkie in Sanford, Florida, that is dead as last weeks [sic] rock and roll hit."

72.     In response to its advocacy efforts on behalf of LGBT rights, the ACLU's Oklahoma affiliate was sent a hostile music video that intercut pictures of activities with images of fire.  The video was delivered with a message that read in part, "A prayer has gone out against you.  It is only a matter of time.  You are unnatural.  When you play with fire you will get burned. You are forcing your disgusting, vile, corrupt, and immoral lifestyle upon people who soundly reject it, and for that you will ultimately suffer consequences.  So be prepared to defend yourselves for the actions you take.  You can never say you were never warned!"

73.     In April 2015, National ACLU and NYCLU's Manhattan offices were the subject of a bomb threat that required a police investigation.  The message that accompanied the threat referred to the terrorist attacks on New York City on September 11, 2001.  Following the attacks, NYCLU was vilified by some for its advocacy on behalf of civil liberties in the face of government anti-terrorism initiatives, and in particular for objecting to discriminatory conduct directed at Muslims and Sikhs.

74.     In late 2018, the Federal Bureau of Investigations ("FBI") informed National ACLU that it was included on a list of intended targets of Cesar Sayoc, the so-called "MAGA Bomber" who was arrested after mailing sixteen packages containing homemade pipe bombs to prominent Democrats, media figures, and celebrities.  Mr. Sayoc's plot was foiled by investigators before any package was sent to National ACLU.

75.     National ACLU and its state affiliates have been repeatedly subjected to harassing, abusive, and threatening commentary online.  In June 2019, a New Mexico man was arrested by the FBI after posting threats to burn down every ACLU office in New Mexico on Facebook and

Twitter.  When confronted by FBI agents, the man admitted to making the threats "[b]ecause everything the ACLU does is promoting corruption with the United States."  The man further advised that he was "ready for civil war" and could "make a body disappear in less than 24 hours."

76.     ACLU-NJ has in recent years been called "an anti U.S. Institution undermining our country" and the "Anti-American Criminal Liberties Union" in comments on online news stories discussing its work.  Earlier this year, an attorney employed by ACLU-NJ tweeted about the organization's criminal justice reform efforts; in response, a Twitter user called him a "scum bag rat" and went on to tell another ACLU-NJ employee in a tweet that her wife should "buy [the attorney] a trash bag and throw that rat away."

77.     In October 2018, in response to a tweet sharing a National ACLU post about its decision to oppose to the nomination of Brett Kavanaugh to the United States Supreme Court, a Twitter user posted a tweet that shared National ACLU's New York address and phone number and stated, in reference to the ACLU, "[n]ext place that should be shut down and every person taken out [to] the shed and whipped till they change their minds."  In June 2019, a user of the Internet message board 4chan alleged that he had "doxed most of the ACLU."  "Doxing" refers to the act of publishing a person's private identifying information on the Internet for malicious purposes.

78.     In July 2019, a person writing under the user name "nosocialists" commented on an article about ACLU abortion rights work "[t]he aclu and [Southern Poverty Law Center] are communist organizations.  Their members should be hunted down and executed no different than antifa[,]" to which another user responded "[p]recisely."

79.     Despite this history of harassment and threats directed at the Plaintiffs, their staff, and their members, and despite their strong commitment to maintaining their donors' anonymity,

ACLU-NJ and National ACLU will be forced to disclose their donors once the Act goes into effect, unless they choose to cease engaging in the activities that bring them within the Act's definition of an IEC.  If they continue to advocate in New Jersey as they have in the past, each organization will be required to report "all contributions received in excess of $10,000" to ELEC, including the name, mailing address, occupation, and employer of those donors making those contributions. N.J.S.A. 19:44A-8(d)(1).

80.     S150 thus presents an untenable choice to ACLU-NJ and National ACLU.  They must either (1) cease issue advocacy activities in New Jersey that would cause them to be classified as IECs in order to shield their donors from public disclosure; or (2) continue to engage in issue advocacy in order to live up to their respective missions and report to ELEC for public disclosure donors who contribute over $10,000.

81.     Faced with these options, ACLU-NJ expects to continue its advocacy efforts and risk losing support from donors who do not want their personal information disclosed, while National ACLU plans to cease work in New Jersey that could qualify it as an IEC, which would, in turn, negatively impact ACLU-NJ's work by depriving it, its members, and the state more broadly, of the resources and expertise of National ACLU.

82.     Furthermore, if they are forced to make the Act's newly-required reports to ELEC, Plaintiffs will be forced to parse a vague statute in an attempt to determine which donors' information they must disclose and which expenditures, including the names of those receiving those expenditures, they must report.  Given the civil and criminal penalties attached to the Act, Plaintiffs may determine that they must err on the side of over-disclosure in order to avoid running

afoul of the law.[10]  This will serve only to exacerbate the chilling effect that S150 will have on Plaintiffs' donors and increase the administrative burden of compliance.

### c.  ACLU-NJ and National ACLU's Respective Leaderships

83.    Also critical to ACLU-NJ's work is its ability to select its own leadership.  In addition to its staff, ACLU-NJ has a board of trustees that is responsible for setting the priorities of the organization, ensuring its financial viability, including by approving the organization's budget and participating in fundraising, hiring and supervising the organization's Executive Director, and serving as ambassadors for the organization in the community.  Trustees are nominated for and then elected to the board in a manner laid out in the organization's by-laws.

84.    S150's leadership restrictions will prevent ACLU-NJ from structuring its board in the manner it deems most appropriate and beneficial for the organization.  Specifically, it will require ACLU-NJ to 1) bar any trustee who is also the chair of a political party committee or a legislative leadership committee from serving as the ACLU-NJ's board chair or treasurer, N.J.S.A. 19:44A-10; and 2) prevent any candidate or holder of public office from serving on its board altogether, N.J.S.A. 19:44A-3.

85.    Ronald K. Chen, a trustee on ACLU-NJ's board, is the Chair of New Jersey's "Governor's Task Force on EDA Tax Incentives," established by Governor Murphy pursuant to Executive Order 52 to investigate tax incentives granted to businesses by the New Jersey

---

[10] For example, in addition to the vague provisions of S150 discussed *infra*, the Act also includes a provision allowing an IEC to "exclude" from "any report filed pursuant" to the section of the Act that imposes reporting requirements on an IEC "the name of and other information relating to any contributor whose contributions during the period covered by the report did not exceed *$300*," N.J.S.A. 19:44A-8(f) (emphasis added), as opposed to the $10,000 disclosure trigger described in N.J.S.A. 19:44A-8(d).  Even where S150 is so clearly internally contradictory, only over-disclosure of protected donor information can fully protect IECs from the risk of civil and criminal penalties.

Economic Development Authority ("EDA").  He has also independently been delegated authority by the Governor under N.J.S.A. 52:15-7 to exercise investigatory powers, including the issuance of administrative subpoenas, concerning the EDA.  Because S150 does not define "public office," the Act may bar Mr. Chen from serving on ACLU-NJ's board unless he resigns from his positions on the EDA task force and as the Governor's delegate pursuant to N.J.S.A. 52:15-7.  Mr. Chen, the former holder of the office of the New Jersey Public Advocate and the former Dean of the Law School of Rutgers, the State University of New Jersey, a public educational institution, has held additional positions in the past that could have implicated S150's leadership restrictions, had the Act been in effect at those times.

86.     Additionally, a trustee currently serving on ACLU-NJ's Board of Trustees is also the chair of a New Jersey municipal party committee.  As a result of S150, ACLU-NJ will be forced to limit this trustee's role within the organization and prevent him from using his leadership skills to the fullest, significantly impacting its ability to organize itself and select its leaders, as well as depriving the organization of the benefits of that trustee's stewardship.  Likewise, ACLU-NJ has had a trustee who contemporaneously served as a member of her local school board in recent years; had S150 been in effect at the time, ACLU-NJ would have been forced to remove the board member from her board position.

87.     National ACLU is overseen by a board of directors, whose members are similarly critical to the operation of the organization.  National ACLU's board currently has four members from New Jersey.  Because National ACLU's by-laws require its board to have among its members a representative of each affiliate, National ACLU's board of directors is likely to always have at least one member from New Jersey serving at any given time.

88.     Mr. Chen, in addition to holding a leadership position with the ACLU-NJ, *supra* ¶85, is one of three people who currently holds the position of "General Counsel" on National ACLU's board.  Mr. Chen is also a member of National ACLU's Executive Committee.  Should S150 be allowed to take effect and should National ACLU thereafter engage in work that would qualify it as an IEC, Mr. Chen may be forced to abandon his positions at National ACLU or those related to the EDA.

89.     If S150 is permitted to take effect, both Plaintiffs will be forced either to reject nominees for their respective boards who hold an outside position that is prohibited by the Act, or to forgo the protected advocacy activities that would otherwise render them IECs under the Act's terms.  Indeed, if a member of the board of an IEC obtains a position as a New Jersey political party committee or legislative leadership committee chair, becomes a candidate for a public office in New Jersey, or is appointed to a public office in New Jersey in the future, the organization will be forced to remove that person from its board or limit her role within the organization, in violation of the associational rights protected by the First Amendment.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Violation of First and Fourteenth Amendments to the United States Constitution
### (brought pursuant to 42 U.S.C. § 1983)

90.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth here.

91.     The First Amendment to the United States Constitution applies to the actions of the State of New Jersey through the Fourteenth Amendment.

92.     S150 violates the First Amendment to the United States Constitution because it regulates, through mandatory public disclosure of their donors and limitations on their leadership, the expressive and associational activity of IECs, as well as their donors, members, staff, and

boards, without a sufficient connection to a substantial governmental interest and in a vague and overbroad manner.

93.     Among the protections afforded to speech and expressive conduct by the First Amendment is the "right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). "The right to speak is often exercised most effectively by combining one's voice with the voices of others." *Rumsfeld v. FAIR*, 547 U.S. 47, 68 (2006) (citation omitted).

94.     Given the "vital relationship between freedom to associate and privacy in one's associations," *NAACP v. Alabama*, 357 U.S. 449, 462 (1958), it has long been the law that the threat of compelled disclosure of the identities of donors significantly impinges on the First Amendment by impairing the freedoms such donors enjoy to exercise their speech and associational rights while remaining anonymous. *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 357 (1995). For example, the First Amendment provides further protection against the compelled disclosure of donor information where such disclosure may subject donors to threats, harassment, or reprisals. *See, e.g.*, *NAACP*, 357 U.S. 449; *Brown v. Socialist Workers '74 Campaign Committee*, 459 U.S. 87 (1982).

95.     S150 violates the associational and expressive rights of Plaintiffs and their supporters, and chills the exercise thereof, by requiring, on pain of civil and criminal penalty, the disclosure of the names and addresses of Plaintiffs' contributors, unless Plaintiffs choose to forgo speech on matters of public concern, which "occupies the highest rung of the hierarchy of First Amendment values[.]" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011).

96.     S150 similarly violates and chills the First Amendment rights of Plaintiffs and their supporters by requiring Plaintiffs to ban certain persons from leadership positions within the

organization, unless Plaintiffs forgo the speech activities that would cause them to be classified as an IEC under the Act.  Any interest the state of New Jersey may have in regulating elections does not justify the broad sweep of the Act.

## SECOND CAUSE OF ACTION
**Violation of First and Fourteenth Amendments to the United States Constitution**
**(brought pursuant to 42 U.S.C. § 1983)**

97.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth here.

98.     S150 violates the Fourteenth Amendment to the United States Constitution because it fails to give persons of ordinary intelligence a reasonable opportunity to know what information IECs must report to ELEC and because it operates to inhibit the exercise of First Amendment freedoms, by pressuring the Plaintiffs, their donors, members, staff, and boards to restrict their expressive and associational conduct to only that which is unquestionably lawful under S150.

## THIRD CAUSE OF ACTION
**Violation of Article I, Paragraph 6 and Article I, Paragraph 18 of the New Jersey Constitution**
**(brought pursuant to the New Jersey Constitution and N.J.S.A. 10:6-2)**

99.     Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth here.

100.     Article I, Paragraph 6 of the New Jersey Constitution guarantees the right of "every person [to] freely speak" and provides that "[n]o law shall be passed to restrain or abridge the liberty of speech[.]"

101.     Article I, Paragraph 18 of the New Jersey Constitution guarantees New Jerseyans "the right freely to assemble together, to consult for the common good, to make known their opinions to their representatives, and to petition for redress of grievances."

102.     S150 violates Article I, Paragraph 6 and Article I, Paragraph 18 of the New Jersey Constitution because it regulates, through mandatory public disclosure of their donors and limitations on their leadership, the expressive and associational activity of IECs, as well as their

donors, members, staff, and boards, without a sufficient connection to a substantial governmental interest and in a vague and overbroad manner.

## FOURTH CAUSE OF ACTION
### Violation of Article I, Paragraph 1 of the New Jersey Constitution
### (brought pursuant to the New Jersey Constitution and N.J.S.A. 10:6-2)

103.    Plaintiffs repeat and reallege the preceding paragraphs as if fully set forth here.

104.    Article I, Paragraph 1 of the New Jersey Constitution guarantees to "all persons . . . certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness."

105.    S150 violates Article 1, Paragraph 1 of the New Jersey Constitution because it fails to give persons of ordinary intelligence a reasonable opportunity to know what information IECs must report to ELEC and because it operates to inhibit the exercise of First Amendment freedoms, by pressuring the Plaintiffs, their donors, members, staff, and boards to restrict their expressive and associational conduct to only that which is unquestionably lawful under the S150.

## <u>REQUESTED RELIEF</u>

WHEREFORE, Plaintiffs ACLU-NJ and National ACLU pray that this Court grant the following relief:

A. a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, that S150 is unconstitutional on its face;

B. a declaration under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, that S150 is unconstitutional as applied to Plaintiffs ACLU-NJ and National ACLU;

C.  a permanent injunction enjoining Defendants from enforcing S150's provisions compelling disclosure of donor information and requiring compliance with its burdensome reporting requirements and leadership restrictions;

D.  an award of Plaintiffs' costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and N.J.S.A. 10:6-2; and

E.  such other relief as the Court may deem just and proper.

Dated: September 10, 2019                    Respectfully submitted,

                                             s/   Lawrence S. Lustberg
                                             Lawrence S. Lustberg, Esq.
                                             Jessica L. Hunter, Esq.
                                             GIBBONS P.C.
                                             One Gateway Center
                                             Newark, NJ 07102-5310
                                             (973) 596-4500
                                             llustberg@gibbonslaw.com
                                             jhunter@gibbonslaw.com

                                             OF COUNSEL:
                                             Jeanne LoCicero, Esq.
                                             American Civil Liberties Union of
                                                 New Jersey Foundation
                                             89 Market Street, 7th Floor
                                             Newark, NJ 07102
                                             (973) 854-1715
                                             jlocicero@aclu-nj.org

                                             David Cole, Esq.*
                                             American Civil Liberties Union
                                                 Foundation, Inc.
                                             915 15th St. NW
                                             Washington, DC 20005
                                             (202) 675-2330
                                             dcole@aclu.org

                                             Brian Hauss, Esq.*
                                             American Civil Liberties Union
                                                 Foundation, Inc.

125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bhauss@aclu.org

*\* Pro hac vice applications to be submitted*